## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **ESTHER KOONTZ,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 17-cv-4099 |
| | ) | |
| **RANDALL D. WATSON,** | ) | |
| **Kansas Commissioner of Education,** | ) | |
| in his official capacity, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S
## MOTION FOR PRELIMINARY INJUNCTION

### INTRODUCTION

Plaintiff Esther Koontz is a curriculum coach and veteran math teacher at a public school in Wichita, Kansas, and a member of the Mennonite Church USA. In response to calls for boycott made by her church and members of her congregation, Ms. Koontz is currently participating in a boycott of consumer goods and services offered by Israeli companies and international companies operating in Israeli settlements in the occupied Palestinian territories. She participates in this boycott to protest the Israeli government's treatment of Palestinians.

Defendant Kansas State Department of Education ("KSDE") selected Ms. Koontz to work as a "teacher trainer," training other math teachers in connection with its Math and Science Partnerships program. Ms. Koontz was eager to share her expertise with teachers throughout Kansas. But pursuant to a new Kansas law, House Bill 2409 ("HB 2409" or the "Act"), all state contractors are required to sign certifications affirming that they are not engaged in boycotts of Israel. When Ms. Koontz responded that she could not sign the form in good conscience, the state refused to contract with her.

HB 2409 violates the Constitution. As the U.S. Supreme Court recognized in *NAACP v. Claiborne Hardware Co.*, political boycotts are fully protected by the First Amendment rights to free expression and free association. By compelling state contractors to certify that they are not engaged in boycotts of Israel, HB 2409 imposes an ideological litmus test intended to penalize people who participate in boycott campaigns to protest the Israeli government. By the same token, the Act restricts *all* state contractors' protected expression without any apparent justification other than impermissible viewpoint discrimination. State contractors are free to engage in a wide variety of expression, including by participating in boycotts on all sorts of issues, but contractors who wish to boycott Israel are marked with a scarlet letter. In sum, the Act violates the First Amendment and the Equal Protection Clause by leveraging state contracts to prevent individuals and companies from fully participating on one side of the public debate regarding Israel and Palestine.

A preliminary injunction is necessary to remedy these blatant constitutional violations. Every day, Ms. Koontz is being financially penalized for refusing to disavow her political boycott. And state contractors throughout Kansas are being forced to sign government certifications about their political expression and associations. It is impossible to determine how many people are being chilled from engaging in protected expression, including speech critical of Israel, because of HB 2409. This Court should therefore issue a preliminary injunction that prohibits Defendant from enforcing the certification requirement with respect to all KSDE contractors. Alternatively, the Court should issue a preliminary injunction enjoining Defendant from enforcing the certification requirement with respect to Ms. Koontz.

# FACTUAL BACKGROUND

## The Act

In June 2017, Kansas enacted House Bill 2409, which requires state contractors to certify that they are not engaged in boycotts of Israel. Section 2(a) of the Act, which went into effect on July 1, 2017, states: "Except as provided in subsection (c), the state shall not enter into a contract with an individual or company to acquire or dispose of services, supplies, information technology or construction, unless such individual or company submits a written certification that such individual or company is not currently engaged in a boycott of Israel." K.S.A. 75-3740f(a). The Act defines "Boycott" to mean:

> [E]ngaging in a refusal to deal, terminating business activities or performing other actions that are intended to limit commercial relations with persons or entities doing business in Israel or in territories controlled by Israel, if those actions are taken either: (1) In compliance with or adherence to calls for a boycott of Israel other than those boycotts to which 50 U.S.C. § 4607(c) applies; or (2) In a manner that discriminates on the basis of nationality, national origin or religion, and that is not based on a valid business reason.

K.S.A. 3740e(a).[1] The Act authorizes the Secretary of Administration to "waive application of this section on any contract with any state agency if the secretary determines that compliance is not practicable." K.S.A. 3740f(c).[2]

HB 2409's legislative history demonstrates that the Act's primary objective is viewpoint discrimination, rather than any legitimate interest relating to government operations. The bill's fiscal note indicated that it "would have no fiscal impact on the Office of Procurement and

---

[1] 50 U.S.C. § 4607 is part of the Export Administration Act ("EAA"), which prohibits U.S. persons from complying with a foreign country's request to boycott a country friendly to the United States. HB 2409 seems to reference the EAA in order to avoid the EAA's preemption provision. *Id.* § 4607(c).

[2] A separate provision of HB 2409 provides that "[t]he state may not adopt a procurement, investment or other policy that has the effect of inducing or requiring a person to boycott the government of Israel or its instrumentalities, or to boycott a person doing business in Israel or territories under its jurisdiction, when such boycott is on the basis of such person's location in such places." K.S.A. 75-3740f(b). That provision is not at issue here.

Contracts operations." Conference Comm. Rep. Br. H.B. 2409, Kan. 2017 Sess., 3. In the House Budget Committee hearing, Representative Powell "explained his support for the legislation" by "emphasiz[ing] the unique relationship between the United States and Israel, and Israel's standing as one of the few democracies in the Middle East." *Id.* at 2. Several private individuals testified in support of the Act, many of whom emphasized the importance of opposing the message of "Boycott, Divestment, Sanctions" ("BDS") campaigns, which seek to apply economic pressure to Israel to protest the Israeli government's treatment of Palestinians in the occupied Palestinian territories and Israel.[3] The Director of Marketing and Research at the Kansas Department of Commerce also testified in support of the Act, "highlighting the economic impact of Israel as a trading partner and ally with Kansas and the United States, as well as examples of Israeli companies that are based in Kansas." Conference Comm. Rep. Br. 2. In the Senate Committee on Federal and State Affairs hearing on the Act, Representative Sutton highlighted Israel's status as an ally of the United States and a trading partner with Kansas, and described BDS as "an act of economic warfare against America's closest ally in the Middle East." *Hearing Before the S. Comm. on Fed. & State Affairs*, Statement of Rep. Sutton 1.

**<u>Ms. Koontz's Decision to Join Her Church's Boycott of Israel</u>**

Ms. Koontz is a member of the Mennonite Church USA. Declaration of Esther Koontz ¶ 2. She has three children with her husband, who has been a Mennonite pastor from 2006 to 2011 and from 2013 to present. *Id.* Their family has attended First Mennonite Church, Hutchinson, for the last four years. *Id.*

---

[3] *See Hearing Before the H. Comm. on Gen. Gov't Budget*, Kan. 2017 Sess., Statement of Margie Robinow 1 ("Without a stance against BDS, the hearts and minds are lost for the next generation, along with the economic impact."); *id.*, Statement of Jacob Pellegrino ("Our campuses are no place for a BDS movement and neither is our state."); *id.*, Statement of Dr. Denice Ross Haynes ("I think the boycott movement . . . keeps alive adversarial ideologies, entitlements and offences.").

In the fall of 2016, a member of Ms. Koontz's congregation made a series of presentations about his recent tour of Israel and Palestine. *Id.* ¶ 4. Over the course of eight sessions, Ms. Koontz and other congregation members watched video presentations from non-governmental organizations, children's rights advocates, former soldiers of the Israel Defense Forces, and others about the Israeli government's treatment of Palestinians. *Id.* ¶ 5. At the conclusion of the series, the presenter asked the gathered congregation members to consider boycotting. *Id. ¶ 6.* Ms. Koontz left the meeting with the conviction that she needed to do her part to support the Palestinians' struggle for equality, even if that simply meant refusing to buy certain consumer products. *Id.* ¶ 8.

On July 6, 2017, the Mennonite Church USA passed a resolution entitled *Seeking Peace in Israel and Palestine*. Koontz Decl., Exhibit A. The resolution calls on Mennonites "to take active and specific steps to redress" the "injustice and violence that both [Palestinians and Jews] have experienced." *Id.* at 1. In particular, the resolution "urge[s] individuals and congregations to avoid the purchase of products associated with acts of violence or policies of military occupation, including items produced in the settlements." *Id.* at 4. In conjunction with this call for boycott, the resolution asks Mennonites "to advocate with the U.S. government to end military aid and arms sales in the region, and to support measures that pressure Israel to freeze settlement construction, respect the civil rights of Palestinian citizens of Israel and the rights of refugees, end the occupation, and work for a just peace in accordance with international law." *Id.*

In adherence to these calls for boycott made by her church and members of her congregation, Ms. Koontz is participating in a boycott of consumer goods and services offered by Israeli companies and international companies operating in Israeli settlements in the occupied Palestinian territories. *Id.* ¶ 10. Ms. Koontz does not limit her boycott to products produced by

companies operating in the settlements because she believes that companies in Israel also profit from the occupation, and because she wants to protest the Israeli government's treatment of Palestinian citizens living in Israel. *Id.* Ms. Koontz's purchasing decisions are based on her political views and her religious and moral beliefs, including her support for Palestinians' human rights. *Id.* ¶ 11.

### Ms. Koontz's Participation in KSDE's Mathematics and Science Partnerships Program

Ms. Koontz is a curriculum coach at Horace Mann Dual Language Magnet School, a public school in Wichita. *Id.* ¶ 12. In this role, she supports the school's curriculum and trains teachers on how to implement it. *Id.* Before becoming a curriculum coach, she was a full-time math teacher in Wichita public schools for nine years. *Id.*

In the 2016-17 academic year, Ms. Koontz was selected to participate as a teacher trainer in KSDE's Math and Science Partnerships program. *Id.* ¶ 13. KSDE runs the Math & Science Partnerships program through their Program Consultant, Melissa Fast. *Id.*; Compl. ¶ 26. Among other things, the program employs "a cadre of teacher trainers that can consult with teachers in other districts around the state" to "help teachers integrate the math content and pedagogy into existing curricula and classroom practices to develop student-centered, 21st century rich learning environments." *Id.* ¶ 25.[4] The program contracts with professional educators, like Ms. Koontz, to provide coaching and training to public school math teachers throughout the state. *Id.* Ms. Koontz viewed the program as an opportunity to grow in her career and earn money to support her family. Koontz Decl. ¶ 15.

---

[4] Kansas State Department of Education, MSP Grants, Current MSP Grants & Contact Information, *Achieving the Vision of Excellent Mathematics Teaching and Learning* 2–3, *available at* http://community.ksde.org/Default.aspx?tabid=5278  (last visited Oct. 8, 2017).

To participate as a teacher trainer in the Math & Science Partnerships program, applicants must complete a two-day training course. *Id.* ¶ 16. Ms. Koontz successfully completed the course on May 30 and 31, 2017. *Id.* She signed up to participate in the program, and Ms. Fast began to send her "training requests" via email. *Id.* ¶ 18. These requests asked if Ms. Koontz was available to conduct trainings around the state on specific dates. *Id.* The requests offered payment of $600/day, plus reimbursement for travel. *Id.*

### The Certification Requirement

On July 10, 2017, Ms. Fast sent an email to the Math & Science Partnerships program participants stating that KSDE's legal department needed them fill out another form in order to receive payments from KSDE. *Id.* ¶ 19. Ms. Fast explained that the form required the participants to certify to KSDE that they are not currently engaged in a boycott of Israel. *Id.* The form attached to Ms. Fast's email was entitled "Certification Individual or Company Not Currently Engaged in a Boycott of Israel." Koontz Decl., Exhibit B. The Certification stated, "In accordance with HB 2409, 2017 Legislative Session, the State of Kansas shall not enter into a contract with any Individual or Company . . . unless such Individual or Company submits a written certification that such Individual or Company is not currently engaged in a boycott of Israel." *Id.* The Certification did not define what constitutes a "boycott of Israel." *See id.*

To complete the Certification, Ms. Koontz would have had to sign below the statement "As an Individual or Contractor entering into a contract with the State of Kansas, it is hereby certified that the Individual or Company listed below is not currently engaged in a boycott of Israel." Koontz Decl. ¶ 20. Ms. Koontz did not immediately reply to the email requiring her to sign the Certification. *Id.* ¶ 21. Ms. Koontz is unable to sign the Certification because she is currently participating in a politically motivated boycott of consumer goods and services offered

by Israeli companies and international companies operating in Israeli settlements in the occupied Palestinian territories. *Id.* ¶ 22.

On August 9, 2017, Ms. Koontz sent an email notifying Ms. Fast of her refusal to sign the Certification, stating that she could not sign the form as a matter of conscience. *Id.* ¶ 23. Ms. Fast responded, "Unfortunately, the state will not allow me to pay you if it is not signed." *Id.* Ms. Koontz is otherwise eligible to participate in the program, and she is still interested in receiving teacher training assignments. *Id.* ¶ 25.

## ARGUMENT

A preliminary injunction is necessary to remedy the irreparable injuries inflicted on Ms. Koontz, as well as state contractors throughout Kansas, by HB 2409's unconstitutional certification requirement. To obtain a preliminary injunction, the moving party must ordinarily demonstrate: "(1) a likelihood of success on the merits; (2) a likelihood that the moving party will suffer irreparable harm if the injunction is not granted; (3) the balance of equities is in the moving party's favor; and (4) the preliminary injunction is in the public interest. In the First Amendment context, the likelihood of success on the merits will often be the determinative factor because of the seminal importance of the interests at stake." *Verlo v. Martinez*, 820 F.3d 1113, 1126 (10th Cir. 2016) (citations and internal quotation marks omitted). On the other hand, "[t]he Tenth Circuit has modified the preliminary injunction test when the moving party demonstrates that the second, third, and fourth factors tip strongly in its favor. In such situations, the moving party may meet the requirement for showing success on the merits by showing that questions going to the merits are so serious, substantial, difficult, and doubtful as to make the

issue ripe for litigation and deserving of more deliberate investigation." *Id.* at 1128 n.5 (citations and internal quotation marks omitted).[5]

Plaintiff satisfies both tests, given that all four factors weigh decisively in her favor. She is entitled to the more lenient standard, given the importance of the First Amendment and Equal Protection Clause rights at stake, both to herself and the general public, as well as the balance of the equities. Because Plaintiff is likely to succeed in demonstrating that Section 2(a) of the Act is unconstitutional both on its face and as applied, the Court should issue a preliminary injunction restraining Defendant from enforcing Section 2(a) with respect to all KSDE contractors. If the Court declines to issue a preliminary injunction restraining enforcement of Section 2(a) with respect to all KSDE contractors, however, it should at the very least issue a preliminary injunction restraining Defendant from enforcing Section 2(a) with respect to Plaintiff.

## I.      Plaintiff Is Likely to Prevail on the Merits.

Plaintiff is likely to succeed in demonstrating that HB 2409's certification requirement violates the First Amendment. It is black letter law that the First Amendment rights to free association and free expression collectively encompass the right to participate in political boycotts. The state cannot condition government contracts on the forfeiture of this right. The Act

_____

[5] The Tenth Circuit applies a more stringent standard—requiring the movant to "demonstrate that, on balance, the four [preliminary injunction] factors weigh heavily and compellingly in his favor"—to three types of disfavored injunctions: "(1) a preliminary injunction that disturbs the status quo; (2) a preliminary injunction that is mandatory as opposed to prohibitory; and (3) a preliminary injunction that affords the movant substantially all the relief he may recover at the conclusion of a full trial on the merits." *O Centro Espirita Benifciente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 977 (10th Cir. 2004) (en banc) (citations and internal quotation marks omitted) (alteration in original), *aff'd*, 546 U.S. 418 (2006). None of those special circumstances applies here: Plaintiff is seeking a prohibitory injunction that would return the status quo before the certification requirement was unconstitutionally applied, and this relief would not be so permanent as to render a trial on the merits superfluous. *See Planned Parenthood of Kansas & Mid-Missouri v. Brownback*, 799 F. Supp. 2d 1218, 1225–27 (D. Kan. 2011), *rev'd on other grounds and vac'd sub nom. Planned Parenthood of Kansas & Mid-Missouri v. Moser*, 747 F.3d 814 (10th Cir. 2014). In any event, Plaintiff satisfies even this stringent standard.

violates this principle in two respects. First, it imposes an ideological litmus test designed to penalize state contractors on the basis of their protected political beliefs and associations. Second, it restricts state contractors from engaging in protected expression, including both boycott participation and boycott-related speech, without any legitimate justification. Finally, the Act violates the Equal Protection Clause by burdening disfavored speakers in the exercise of their fundamental First Amendment rights. Plaintiff is likely to prevail on all three of these theories, but she need prevail on only one for this Court to issue a preliminary injunction.

### A. The First Amendment Protects the Right to Engage in Political Boycotts.

Since the Supreme Court's landmark decision in *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982), it has been clear that the First Amendment protects the right to engage in politically motivated boycotts. *Claiborne* concerned a boycott of white-owned businesses in Port Gibson, Mississippi. *Id.* at 889. The boycott, which was organized with the help of the NAACP in March and April of 1966, was meant to protest ongoing racial segregation and widespread racial inequality in the community. *Id.* Three years later, several merchants targeted by the boycott filed a lawsuit against the boycotters in Mississippi state court, seeking to recover business losses caused by the boycott and enjoin future boycott activity. *Id.* The Mississippi Supreme Court upheld the trial court's imposition of liability, concluding that "the entire boycott was unlawful" because the trial court had found that it was enforced through force, threats, and violence. *See id.* at 895. The court summarily rejected the boycotters' First Amendment defense. *Id.*

The U.S. Supreme Court reversed, holding in relevant part that "the nonviolent elements of [the boycotters'] activities are entitled to the protection of the First Amendment." *Id.* at 915; *see also id.* ("The Mississippi Supreme Court did not sustain the chancellor's imposition of liability on a theory that state law prohibited a nonviolent, politically motivated boycott. The fact

that such activity is constitutionally protected, however, imposes a special obligation on this Court to examine critically the basis on which liability was imposed."). The Court began its analysis by pointing out that many elements of the boycott had already been recognized as "form[s] of speech or conduct that [are] ordinarily entitled to protection under the First and Fourteenth Amendments." *Id.* at 907. The First Amendment right of association protects "the practice of persons sharing common views banding together to achieve a common end." *Id.* (quoting *Citizens Against Rent Control Coalition for Fair Housing v. Berkeley*, 454 U.S. 290, 294 (1981)) (internal quotation marks omitted). Participation in peaceful marches and demonstrations in support of a boycott is "protected by the rights of free speech, free assembly, and freedom to petition for a redress of grievances." *Id.* at 909. And the right to free speech further protects the solicitation of nonparticipants to join a boycott and the use of social pressure to discourage holdouts. *Id.* at 910–11.

The Court went further, though, concluding that the boycott *itself* was entitled to First Amendment protection. Although the Court acknowledged that "States have broad power to regulate economic activity," it did "not find a comparable right to prohibit peaceful political activity such as that found in the boycott in this case." *Id.* at 913. To the contrary, the Court observed that such "expression on public issues has always rested on the highest rung of the hierarchy of First Amendment values." *Id.* (quoting *Carey v. Brown*, 447 U.S. 455, 467 (1980)). Emphasizing that "speech concerning public affairs is more than self-expression; it is the essence of self-government," the Court reiterated the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *Id.* (citations and internal quotation marks omitted). It concluded: "At the heart of the [state court's] opinion lies the belief that the mere organization of the boycott and every activity undertaken in support

thereof could be subject to judicial prohibition under state law. This view accords insufficient weight to the First Amendment's protection of political speech and association." *Id.* at 914–15 (approvingly quoting *Henry v. First Nat'l Bank of Clarksdale*, 595 F.2d 291, 303 (5th Cir. 1979)) (internal quotation marks omitted).[6]

Since *Claiborne*, the Supreme Court has repeatedly reaffirmed that the First Amendment protects the right to engage in political boycotts. *See FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 428 (1998) ("Only after recognizing the well-settled validity of prohibitions against various economic boycotts did we conclude in Claiborne Hardware that 'peaceful, political activity such as that found in the [Mississippi] boycott' are entitled to constitutional protection."); *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 508 (1988) ("In [*Claiborne*] we held that the First Amendment protected the nonviolent elements of a boycott of white merchants organized by the [NAACP] and designed to make white government and business leaders comply with a list of demands for equality and racial justice."); *see also, e.g.*, *Barnes Found. v. Twp. of Lower Merion*, 927 F. Supp. 874, 876 (1996) (citing *Claiborne* for the proposition that the First Amendment "immunizes citizens from liability for exercising right to boycott").

The principle laid down in *Claiborne* protects Ms. Koontz. Along with likeminded people throughout Kansas and the United States, she is participating in a political boycott of Israel. To

---

[6] The Court distinguished economic boycotts "meant to destroy legitimate business competition" or otherwise attain a particular advantage in the market, which generally do not receive First Amendment protection. *Id.* at 914; *see also FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 427 & n.10 (1998) (distinguishing the political boycott in *Claiborne* from economic boycotts "by business competitors who 'stand to profit financially from a lessening of competition in the boycotted market'" (quoting *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 508 (1988)). With respect to these boycotts, the Court "recognized the strong governmental interest in certain forms of economic regulation, even though such regulation may have an incidental effect on rights of speech and association." *Claiborne*, 458 U.S. at 912.

protest the Israeli government's treatment of Palestinians, she refuses to buy products made by Israeli companies and international companies operating in Israeli settlements in the occupied Palestinian territories. Like the boycotters in *Claiborne*, Ms. Koontz is "not motivated by any desire to lessen competition or to reap economic benefits," nor does she "stand to profit financially from a lessening of competition in the boycotted market." *Allied Tube*, 486 U.S. at 508. Rather, she is motivated by the aim of "vindicat[ing] rights of equality and freedom," and by her belief that those rights are currently being denied to Palestinians. *Claiborne*, 458 U.S. at 914. Because Ms. Koontz's boycott is "designed to force governmental and economic change," it is "entitled to the protection of the First Amendment." *Id.* at 914–15.

**B.      HB 2409 Violates the First Amendment Because It Imposes an Ideological Litmus Test on State Contractors.**

HB 2409 violates the fundamental First Amendment guarantee against government inquisition into people's protected political beliefs and associations. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *West Virginia St. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). One of the core purposes of the First Amendment is to preserve the "sphere of intellect and spirit" from "all official control." *Id.* at 642. Since *Barnette*, the Supreme Court has consistently emphasized that the right to hold one's personal "beliefs and to associate with others of [like-minded] political persuasion" lies at the heart of the First Amendment. *Elrod v. Burns*, 427 U.S. 347, 356 (1976). "[T]he practice of persons sharing common views banding together to achieve a common end," whether through association with a political party or a boycott campaign, "is deeply embedded in the American political process." *Claiborne*, 458 U.S. at 907 (quoting *Citizens Against Rent Control Coal. for Fair Hous.*, 454 U.S. at 294). To protect these

rights, the First Amendment prohibits the state from imposing ideological litmus tests as a condition of receiving government benefits.

The Supreme Court's decision in *Baird v. State Bar of Arizona* is instructive. There, the Court held that the First Amendment prohibited the state bar from requiring an applicant "to state whether she had ever been a member of the Communist Party or any organization 'that advocates overthrow of the United States Government by force or violence.'" 401 U.S. 1, 4–5 (1971). Writing for the plurality, Justice Black stated: "[W]hen a State attempts to make inquiries about a person's beliefs or associations, its power is limited by the First Amendment. Broad and sweeping state inquiries into these protected areas, as Arizona has engaged in here, discourage citizens from exercising rights protected by the Constitution." *Id.* at 6. Accordingly, when a State inquires into these protected areas, "a heavy burden lies upon it to show that the inquiry is necessary to protect a legitimate state interest." *Id.* at 6–7. "And whatever justification may be offered, a State may not inquire about a man's views or associations solely for the purpose of withholding a right or benefit because of what he believes." *Id.* at 7; *Speiser v. Randall*, 357 U.S. 513, 514–15 (1958) (invalidating a requirement that veterans applying for a property tax exemption subscribe to an oath disavowing the overthrow of the government and any support for foreign governments hostile to the United States).

The same principle applies to conditions on government employment and government contracts. *See, e.g.*, *Agency for Int'l Dev. v. All. for Open Society Int'l, Inc.*, 133 S. Ct. 2321, 2330 (2013) (holding that the government could not require organizations to adopt a policy opposing prostitution as a condition of receiving government funds) ("By requiring [funding] recipients to profess a specific belief, the Policy requirement goes beyond defining the limits of the federally funded program to defining the recipient."); *Bd. of Cnty. Comm'rs v. Umbehr*, 518

U.S. 668, 674–75 (1996) ("We have held that government workers are constitutionally protected from dismissal for refusing to take an oath regarding their political affiliation" (citations omitted)). Any attempt to penalize a government employee's or contractor's protected political beliefs or associations violates the First Amendment, unless the nature of the goods or services provided "requires political allegiance." *Jantzen v. Hawkins*, 188 F.3d 1247, 1251 (10th Cir. 1999) (applying this test to employees); *see also O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 726 (1996) (holding that the same test applies to public employees and government contractors).[7]

As HB 2409's legislative history demonstrates, *supra* n.3, the Act's certification requirement is squarely aimed at punishing disfavored political beliefs and associations—i.e., boycott campaigns aimed at Israel and BDS campaigns in particular. In his testimony supporting the Act, Representative Sutton described BDS as "an act of economic warfare against America's closest ally in the Middle East." Statement of Rep. Sutton 1. Proponent Margie Robinow testified that, "[w]ithout a stance against BDS, the hearts and minds are lost for the next generation." Statement of Margie Robinow 2. Proponent Jacob Pellegrino testified that "[o]ur campuses are no place for a BDS movement and neither is our state." Statement of Jacob Pellegrino. And Proponent Dr. Denice Ross Haynes testified that "the boycott movement . . . keeps alive adversarial ideologies, entitlements and offences." Statement of Dr. Denice Ross Haynes. Whatever one may think of BDS campaigns, though, they are protected by the First Amendment.

---

[7] Here, there is no reason to believe that every single state contractor occupies a position requiring political allegiance. *See Barker v. City of Del City*, 215 F.3d 1134, 1138 (10th Cir. 2000) (the government "bears the burden of providing 'whether political association was an appropriate requirement for the effective performance of the public office involved'" (quoting *Jantzen*, 188 F.3d at 1253)). Even if some small subset of state contractors do occupy such positions, the Act's application to *all* state contractors is substantially overbroad. *See Broadrick v. Oklahoma*, 413 U.S. 601 (1973)

Just as aspiring lawyers and government employees during the Cold War were required to swear that they were not members of the Communist party, state contractors in Kansas are required to certify that they are not participating in boycotts of Israel. Of course, there are many people in Kansas who do no business with Israeli companies or with companies doing business in Israeli settlements in the occupied Palestinian territories, for any number of reasons. The Act penalizes only those who refuse to disavow their participation in a boycott. Thus, the Act prohibits Ms. Koontz from receiving any state contracts because she made the conscientious decision, together with members of her church, to participate in a boycott of Israeli companies and international companies operating in Israeli settlements in the occupied Palestinian territories. Other state contractors who do not buy the exact same products for personal or pragmatic reasons are left unscathed. There is no plausible justification for either the loyalty oath or the certification requirement, except the desire to identify, punish, and chill disfavored political beliefs and associations. That justification cannot survive First Amendment scrutiny. *See Baird*, 401 U.S. at 7.

### C.  HB 2409 Violates the First Amendment Because It Unconstitutionally Restricts State Contractors' Protected Expression.

HB 2409 also violates the First Amendment by imposing a blanket, viewpoint discriminatory restriction on state contractors' protected boycott participation and related speech. To determine whether the government has unconstitutionally infringed a state contractor's freedom of expression, courts apply the same doctrinal analysis used to assess government employee speech claims. *Umbehr*, 518 U.S. at 678–79; *see generally Pickering v. Bd. of Ed.*, 391 U.S. 563 (1968). Such cases "usually involve[] disciplinary actions taken in response to a government employee's speech." *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 466 (1995) (striking down a federal statute prohibiting government employees from accepting

honoraria for outside speaking and writing engagements). The First Amendment harms at issue here are much graver.

First, HB 2409's "widespread impact . . . gives rise to far more serious [First Amendment] concerns than could any single supervisory decision." *Id.* at 468. By requiring *all* state contractors to certify that they are not engaged in boycotts of Israel, the Act directly prohibits a wide amount of protected expression. Like the boycott participants in *Claiborne*, Ms. Koontz and other boycott participants seek "to bring about political, social, and economic change" through the "exercise of these First Amendment rights." *Claiborne*, 458 U.S. at 911. These boycotts are a form of "political speech lying at the core of the First Amendment." *Id.* at 915 (quoting *Henry*, 595 F.2d at 303) (internal quotation marks omitted). Blanket restrictions on political expression undermine our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *Id.* at 913 (citations and internal quotation marks omitted). Such laws are subject to "exacting scrutiny." *E.g.*, *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995).

Second, "unlike an adverse action taken in response to actual speech," HB 2409 "chills speech before it happens." *NTEU*, 513 U.S. at 468. The Act directly restricts state contractors from participating in boycotts of Israel. But it also indirectly suppresses a wide range of related expression and association. Political boycotts typically involve a range of First Amendment protected activity in addition to the decision not to purchase certain products, including: speech about the boycott and related issues, association with other boycott participants, demonstrations in support of the boycott, and petitions to public officials. *See Claiborne*, 458 U.S. at 907–12. By requiring state contractors to certify that they are not engaged in boycotts of Israel, the Act chills state contractors from exercising *all* of those protected First Amendment rights, for fear that such

expression could create suspicion about forbidden boycott participation. Indeed, because the Certification does not even explain what constitutes a boycott of Israel, state contractors are likely to engage in a wide degree of self-censorship to avoid any hint of impropriety. This "large-scale disincentive to [state contractors'] expression also imposes a significant burden on the public's right to read and hear what the employees would otherwise have written and said." *NTEU*, 513 U.S. at 470.

In light of these glaring First Amendment concerns, the state bears a much heavier burden of justification than it would in a run of the mill public employee speech case. *Id.* at 468 It "must show that the interests of both potential audiences and a vast group of present and future [contractors] in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government" *Id.* (quoting *Pickering*, 391 U.S. at 571). To make this showing, the state "must do more than simply 'posit the existence of the disease sought to be cured.' . . . It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Id.* at 475 (omission in original) (quoting *Turner Broad. Sys., Inc. v. FCC,* 512 U.S. 622, 664 (1994).

The state cannot make that showing here. Indeed, HB 2409's fiscal note itself indicates that the Act has "no fiscal impact on the Office of Procurement and Contracts operations." Conference Comm. Rep. Br. 3. It is therefore difficult to see how participation in political boycotts of Israel "so menaces the 'actual operation of the government,' as to render the [Act's] significant restriction of [contractor] speech an acceptable response." *Sanjour v. EPA*, 56 F.3d 85, 95 (D.C. Cir. 1995) (en banc) (quoting *NTEU*, 513 U.S. at 468). If the Act is premised on concern that Israel may seek to limit its trade relationship with Kansas in response to such

boycotts, that interest is premised on an illegitimate heckler's veto. *See, e.g.*, *Matal v. Tam*, 137 S. Ct. 1744, 1763 (2017) ("We have said time and again that the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers." (citation and internal quotation marks omitted) (collecting cases)); *Boos v. Barry*, 485 U.S. 312, 322 (1988) (striking down a District of Columbia provision prohibiting display of signs bringing foreign government into disrepute within 500 feet of the embassy) ("As a general matter, we have indicated that in public debate our own citizens must tolerate insulting, and even outrageous, speech in order to provide adequate breathing space to the freedoms protected by the First Amendment. . . . We are not persuaded that the differences between foreign officials and American citizens require us to deviate from these principles here." (citation and internal quotation marks omitted)).

Moreover, the complete absence of any tailoring belies any suggestion that HB 2409 is reasonably necessary to protect the state's foreign and trade relations. Trade relations with foreign countries such as Israel involve a host of economic and financial arrangements, but the Act leaves the vast majority of these relationships entirely unregulated while singling out participation in boycott activity aimed at Israel—no matter how small its actual economic impact—for special disfavor. *See NTEU*, 513 U.S. at 475 ("The fact that § 501 singles out expressive activity for special regulation heightens the Government's burden of justification."). On the other hand, the state's readiness to waive the certification requirement—by authorizing the Secretary of Administration to "waive application of this section on any contract" if the Secretary determines "that compliance is not practicable," K.S.A. 75-3740f(c)—strongly suggests that the expression at issue will not seriously undermine the state's legitimate interests. *See, e.g.*, *City of Ladue v. Gilleo*, 512 U.S. 43, 52 (1994) ("Exemptions from an otherwise

legitimate regulation of a medium of speech . . . . may diminish the credibility of the government's rationale for restricting speech in the first place."). Taken together, "[t]hese anomalies in the text of the statute . . . underscore [the] conclusion" that whatever "speculative benefits" the Act may provide "are not sufficient to justify this crudely crafted burden on [state contractors'] freedom to engage in expressive activities." *NTEU*, 513 U.S. at 477.

Even if the Act *could* constitutionally be applied to some subset of state contractors, it is nonetheless facially invalid because it is overinclusive. "If the government has a substantial interest with respect to only a subcategory of the restricted speech, then its interest will not readily outweigh the burden imposed on the larger category of speech subject to regulation." *Sanjour*, 56 F.3d at 97. Thus, "[i]n performing the *Pickering* balance . . . the courts must consider whether the challenged statute or regulation is tailored to address the harm that the government allegedly aims to protect." *Id.* (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989)). Here, even if there were some limited subset of state contractors whose boycott activity legitimately implicated state interests (e.g., contractors who boycott Israeli companies for anticompetitive purposes), that would not justify preventing all state contractors—including individual service providers, small businesses, and social service agencies—from participating in protected political boycotts. *See id.* at 98 ("[W]e believe that the extraordinary reach of the challenged regulations places a heavy justificatory burden on the government—or put another way, the great quantity of speech affected by the regulatory scheme weighs heavily on the side of the employees.").[8]

---

[8] The D.C. Circuit has instructed that the *NTEU* balancing test is the appropriate standard for evaluating both facial and as-applied challenges to statutes and regulations restricting the speech of government employees and contractors. *See id.* at 92 & n.10. Plaintiff therefore does not frame this aspect of her challenge in terms of the substantial overbreadth doctrine. If the Court

More likely, though, HB 2409 is intended to accomplish precisely what *Claiborne* prohibits—the suppression of political boycotts. But whereas *Claiborne* concerned a state law that at least theoretically applied to all political boycotts, HB 2409 compounds the First Amendment violation by targeting specific boycotts based on their content and viewpoint. "The First Amendment generally prevents government from proscribing speech, or even expressive conduct, because of disapproval of the ideas expressed. Content-based regulations are presumptively invalid." *RAV v. City of St. Paul*, 505 U.S. 377, 382 (1992) (citations omitted). The category of content discrimination "includes a subtype of laws that go further, aimed at the suppression of particular views . . . on the subject." *Matal*, 137 S. Ct. at 1766 (2017) (Kennedy, J., concurring in part and concurring in the judgment) (citation omitted) (alteration in original). "At its most basic, the test for viewpoint discrimination is whether—within the relevant subject category—the government has singled out a subset of messages for disfavor based on the views expressed." *Id*. "It is perhaps the most fundamental principle of First Amendment jurisprudence that the government may not regulate speech on the ground that it expresses a dissenting viewpoint." *Sanjour*, 56 F.3d at 96.

As discussed above, *supra* at 15–16, suppression of dissenting viewpoints is HB 2409's main purpose. The Act prohibits state contractors from participating in boycotts of Israel, but allows them to participate in other political boycotts—including boycotts of other foreign countries and "reverse boycotts" targeting entities that are themselves engaged in boycotts of Israel.[9] This is quintessential viewpoint discrimination. *See, e.g.*, *Sanjour*, 56 F.3d at 96–97 (concluding that federal regulations prohibiting government employees from receiving

---

disagrees, Plaintiff respectfully requests that the Court alternatively construe the foregoing as a substantial overbreadth claim.

[9] *See, e.g.*, Roz Rothstein & Roberta Seid, *Boycott the Boycotters*, Jewish Journal, Aug. 25, 2010, *available at:* http://jewishjournal.com/opinion/82483/ (last visited Oct. 8, 2017).

reimbursement for unofficial speaking engagements were likely viewpoint discriminatory because it appeared that the government would not approve reimbursement for anti-government speech). At the very least, the Act's selective prohibition is content discriminatory because it prevents state contractors from participating in boycotts based on the subject matter of those boycotts—i.e., Israel. *See, e.g.*, *Police Dep't of City of Chi. v. Mosley*, 408 U.S. 92, 95 (1972) (holding that a Chicago ordinance exempting peaceful labor picketing from a general prohibition on picketing next to a school was content discriminatory because it "describe[d] permissible picketing in terms of its subject matter").

### D.       The Act Violates the Equal Protection Clause

HB 2409 also violates the Equal Protection Clause by penalizing certain individuals and companies based on their protected political beliefs, associations, and expression without sufficient justification. *See Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 563–64 (2011) (striking down a law restricting sale and disclosure of pharmacy records revealing the prescribing practice of individual doctors because law "on its face burden[ed] disfavored speech by disfavored speakers"); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995) ("[G]overnment regulation may not favor one speaker over another."); *Riddle v. Hickenlooper*, 742 F.3d 922, 927–28 (10th Cir. 2014) (holding that state statute classifying individual contributions to write-in candidates differently from individual contributions to major party candidates violated the Equal Protection Clause); *see also, e.g.*, *Mosley*, 408 U.S. at 101 ("The Equal Protection Clause requires that statutes affecting First Amendment interests be narrowly tailored to their legitimate objectives.").

The Act penalizes only state contractors who are participating in boycotts of Israel, while allowing other individuals and companies to continue receiving government contracts. This is classic speaker-based discrimination. "Because the right to engage in political expression is

fundamental to our constitutional system, statutory classifications impinging upon that right must be narrowly tailored to serve a compelling governmental interest." *Austin v. Mich. Chamber of Commerce,* 494 U.S. 652, 666 (1990), *overruled in part on other grounds*, *Citizens United v. Fed. Election Comm'n,* 558 U.S. 310, 347–65 (2010). As discussed above, the Act is not narrowly tailored to any legitimate government objectives.

**E.    The Act Violates the First Amendment and the Equal Protection Clause As Applied to Ms. Koontz.**

Even if the Court concludes that facial relief is inappropriate at this stage, it should enjoin Defendants from enforcing the Act against Plaintiff. Ms. Koontz is taking part in a voluntary boycott of Israel, in adherence to calls made by the Mennonite Church USA and members of her congregation. Ms. Koontz participates in this boycott by refusing to use her personal income to purchase consumer goods and services offered by Israeli companies and international companies operating in Israeli settlements in the occupied Palestinian territories. Ms. Koontz's participation in this political boycott is fully protected by the First Amendment. Whatever interests Defendants may assert to defend HB 2409 as a whole, there is simply no justification for denying Ms. Koontz the opportunity to train math teachers as a contractor with KSDE's Math and Science Partnerships program.

**II.    Plaintiff Will Suffer Irreparable Harm Absent an Injunction.**

HB 2409 is currently imposing irreparable harm on Ms. Koontz and similarly situated state contractors throughout Kansas. The Supreme Court, the Tenth Circuit, and this Court have all held that a violation of constitutional rights, even temporarily, amounts to irreparable harm for purposes of the preliminary injunction analysis. *See, e.g.*, *Elrod*, 427 U.S. at 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Verlo v. Martinez*, 820 F.3d 1113, 1127 (10th Cir. 2016);

*Abilene Retail #30, Inc. v. Six*, 641 F. Supp. 2d 1185, 1199 (D. Kan. 2009). The state refuses to contract with Ms. Koontz unless and until she ceases participating in her protected political boycott and signs the Certification; other state contractors are being put to the same unconstitutional choice between their political beliefs and their livelihoods. All state contractors are being subjected to an unconstitutional inquisition into their political beliefs. Moreover, it is impossible to determine how much protected expression is currently being chilled by the Act. A preliminary injunction is necessary to relieve these significant constitutional harms.

III.     **The Balance of Harms Tips Sharply in Plaintiff's Favor.**

In contrast to the irreparable harm the Act is currently inflicting on Ms. Koontz and other state contractors, the issuance of a preliminary injunction in this case poses little, if any, risk of irreparable harm to Defendant's legitimate interests. *See Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010) (stating that the government "does not have an interest in enforcing a law that is likely constitutionally infirm"). Under such circumstances, the scales tip decisively in favor of a preliminary injunction. *See ACLU v. Johnson*, 194 F.3d 1149, 1163 (10th Cir. 1999) ("[T]hreatened injury to [constitutional rights] outweighs whatever damage the preliminary injunction may cause Defendants' inability to enforce what appears to be an unconstitutional statute." (citation omitted)).

Furthermore, a preliminary injunction in this case would largely maintain the status quo. HB 2409 took effect only a few months ago, and presumably many state contractors have not yet been forced to sign the Certification. If an injunction issues now, these contractors will be spared an unconstitutional inquisition into their political beliefs, associations, and expression. This consideration is particularly salient because the Certification compels speech, a harm that cannot be completely undone once the Certification is signed.

#### IV. Granting a Preliminary Injunction Serves the Public Interest.

Finally, the public interest in this case supports the issuance of a preliminary injunction. The public interest is served by an injunction that protects constitutional rights. *See, e.g.*, *ACLU*, 194 F.3d at 1163; *Utah Licensed Beverage Ass'n v. Leavitt*, 256 F.3d 1061, 1076 (10th Cir. 2001); *Elam Constr., Inc. v. Reg'l Transp. Dist.*, 129 F.3d 1343, 1347 (10th Cir. 1997). Here, the public interest—in particular, the First Amendment and Equal Protection Clause rights of Kansas's state contractors—will be furthered by a preliminary injunction.

### CONCLUSION

For the foregoing reasons, the Court should issue a preliminary injunction prohibiting Defendant from enforcing the certification requirement with respect to all KSDE contractors. Alternatively, the Court should issue a preliminary injunction prohibiting Defendant from enforcing the certification requirement with respect to Ms. Koontz.

Respectfully submitted,

/s/ Stephen Douglas Bonney
Stephen Douglas Bonney, KS Bar No. 12322
ACLU Foundation of Kansas
6701 W. 64th Street, Suite 210
Overland Park, KS 66202
Telephone: (913) 490-4102
dbonney@aclukansas.org

Brian Hauss*
Vera Eidelman*
Ben Wizner*
ACLU Foundation
Speech, Privacy & Technology Project
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2500
bhauss@aclu.org
veidelman@aclu.org
bwizner@aclu.org
*Applications for *pro hac vice* forthcoming

**CERTIFICATE OF SERVICE**

I hereby certify that on October 11, 2017, I caused a copy of this Memorandum in Support of Plaintiff's Motion for Preliminary Injunction to be served on the following, both by electronic mail and by first class mail.

Randall Watson
Kansas Commissioner of Education
900 SW Jackson Street
Topeka, KS 66612
rwatson@ksde.org

Derek Schmidt
Attorney General of Kansas
Memorial Hall, 2nd Floor
120 SW 10th Street
Topeka, KS 66612
general@ksag.org

DATED this 11th day of October, 2017.          /s/ Stephen Douglas Bonney
                                                Stephen Douglas Bonney