## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

ESTHER KOONTZ,

              Plaintiff,

v.

RANDALL D. WATSON, KANSAS
COMMISSIONER OF EDUCATION, in
His official capacity as Kansas
Commissioner of Education,

              Defendant.

Case No.  17-4099-DDC-KGS

_____

## MEMORANDUM AND ORDER

      In this lawsuit, plaintiff Esther Koontz seeks injunctive and declaratory relief under 42

U.S.C. § 1983.  She asks the court to enjoin enforcement of a Kansas law requiring all persons

who enter into a contract with the State of Kansas to certify that they are not engaged in a

boycott of Israel.  Ms. Koontz claims that this law violates both the First Amendment and the

Fourteenth Amendment's Equal Protection Clause.  This matter comes before the court on Ms.

Koontz's Motion for Preliminary Injunction (Doc. 3).  The parties have briefed the issue fully

and presented oral argument on it.

      Judging the constitutionality of democratically enacted laws is among "the gravest and

most delicate" enterprises a federal court ever undertakes.  *Blodgett v. Holden*, 275 U.S. 142,

147–48 (1927) (Holmes, J., concurring).  But just as surely, following precedent is a core

component of the rule of law.  When the Supreme Court or our Circuit has established a clear

rule of law, our court must follow it.  *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490

U.S. 477, 484 (1989).  As this Order explains, the Supreme Court has held that the First

Amendment protects the right to participate in a boycott like the one punished by the Kansas law. The court thus grants plaintiff's motion and imposes the preliminary injunction specified at the end of this Order.

## I.     Facts

### House Bill 2409

In June 2017, Kansas enacted House Bill 2409 ("the Kansas Law"). This law requires all state contractors to certify that they are not engaged in a boycott of Israel. Kan. Stat. Ann. § 75-3740f(a). The Kansas Law defines a "boycott" as:

> [E]ngaging in a refusal to deal, terminating business activities or performing other actions that are intended to limit commercial relations with persons or entities doing business in Israel or in territories controlled by Israel, if those actions are taken either: (1) In compliance with or adherence to calls for a boycott of Israel other than those boycotts to which 50 U.S.C. § 4607(c)[1] applies; or (2) in a manner that discriminates on the basis of nationality, national origin or religion, and that is not based on a valid business reason . . . .

Id. § 75-3740e(a). The Kansas Law also allows the Secretary of Administration for the State of Kansas to waive this requirement "if the secretary determines that compliance is not practicable." Id. § 75-3740f(c). The Kansas Law took effect on July 1, 2017. 2017 Kan. Sess. Laws 1126.

Multiple legislators made statements during debate about the Kansas Law that its purpose was to stop people from antagonizing Israel. And multiple private individuals testified to the same effect. Several individuals emphasized the need to oppose "Boycott, Divestment, Sanctions" campaigns, which protest the Israeli government's treatment of Palestinians in the occupied Palestinian territories and Israel by applying economic pressure to Israel. During a

---

[1] This federal provision preempts state law from contradicting a federal statute prohibiting certain types of boycotts. See 50 U.S.C. § 4607(a)(1). Plaintiff does not assert that the Kansas Law conflicts with the federal provision.

committee hearing about the bill[2] that became the Kansas Law, the Director of Marketing and

Research for the Kansas Department of Commerce testified that Israel and Kansas are substantial

trading partners.  The Department of Commerce calculated that in 2016, Kansas exported $56

million worth of commodities to Israel while importing $83 million from Israel.  The Kansas

Law's fiscal note asserted that the Kansas Law would not affect the Kansas state government

fiscally.

*Plaintiff's Boycott of Israel*

In May 2017, plaintiff Esther Koontz began boycotting Israeli businesses.  She first

became motivated to boycott Israel in 2016 when she saw a presentation about conditions in

Israel and Palestine.  And on July 6, 2017, Mennonite Church USA passed a resolution calling

on Mennonites to take steps to redress the injustice and violence that both Palestinians and

Israelis have experienced.  Ms. Koontz is a member of a Mennonite Church organization.

Specifically, this organization's resolution called on Mennonites to boycott products associated

with Israel's occupation of Palestine.  As a consequence, plaintiff decided she would not buy any

products or services from Israeli companies or from any company who operates in Israeli-

occupied Palestine.

*Plaintiff's Efforts to Contract with Kansas*

Plaintiff is a curriculum coach at a public school in Wichita, Kansas.  As part of her

regular duties, she supports her school's curriculum and teaches teachers how to implement it.

Before she began working in this position, plaintiff taught math in the Wichita public schools.

During the 2016-17 academic year, the Kansas State Department of Education ("KSDE")

selected plaintiff to participate as a teacher trainer in KSDE's Math and Science Partnership

program.  In this program, KSDE contracts with professional educators to provide coaching and

---

[2]        House Bill 2409

training to public school math and science teachers throughout Kansas.  Plaintiff wants to participate in the program, both to enhance her career and earn extra spending money.  Plaintiff would have earned an extra $600 per day (plus travel expenses) for each training she gives.

On May 31, 2017, plaintiff successfully completed the requisite training to serve as trainer for the program.  Shortly afterward, the program director for the Math and Science Partnership, Melissa Fast, began sending plaintiff travel requests asking her to lead training programs for other teachers.  Plaintiff said she was willing to conduct three of the trainings that Ms. Fast initially offered her.  In the future, plaintiff asserts, she would like to do as many training sessions as she can.

On July 10, 2017, the program director asked Ms. Koontz to sign a certification confirming that she was not participating in a boycott of Israel, as the Kansas Law requires. Initially, plaintiff did not respond because she wanted to consider her options.  On August 9, 2017, plaintiff emailed the program director and told her that she had decided to refuse to sign the certification.  The program director responded that Kansas could not pay plaintiff as a contractor unless she signed the certification.

Despite plaintiff's eligibility and interest in participating in the Math and Science Partnership program, the KSDE declined to contract with plaintiff because she would not sign the certification.  But in this case, defendant Randall D. Watson[3] submitted an affidavit from the Secretary of Administration, Sarah Shipman.  It asserts that Secretary Shipman would have waived the certification requirement if plaintiff had asked her to do so.  It is undisputed that plaintiff did not apply for the waiver authorized by Kan. Stat. Ann. § 75-3740f(c).

---

[3]      Randall Watson is the Kansas Commissioner of Education and the Chief Administrative Officer of the KSDE.  He is charged with enforcing compliance with the Kansas Law for all KSDE independent contractors.

**II.     Ripeness**

Before the court can reach the merits of plaintiff's motion, it must decide whether her claim is ripe for judicial review. *Kan. Judicial Review v. Stout*, 519 F.3d 1107, 1114 (10th Cir. 2008). This ripeness requirement is a component of justiciability. "In order for a claim to be justiciable under Article III [of the Constitution], it must present a live controversy, ripe for determination, advanced in a 'clean-cut and concrete form.'" *Id.* at 1116 (quoting *Renne v. Geary*, 501 U.S. 312, 322 (1991)).[4]

Typically, federal courts "apply a two-factor test to determine whether an issue is ripe." *Id.* These factors evaluate the fitness of "the issue for judicial resolution and the hardship to the parties of withholding judicial consideration." *Sierra Club v. Yeutter*, 911 F.2d 1405, 1415 (10th Cir. 1990). But when the claim presents a First Amendment facial challenge, the "ripeness analysis is 'relaxed somewhat' . . . because an unconstitutional law may chill free speech." *Stout*, 519 F.3d at 1116 (quoting *New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1499 (10th Cir. 1995)).

The ripeness factors considered in a facial First Amendment challenge case are: "(1) hardship to the parties by withholding review; (2) the chilling effect the challenged law may have on First Amendment liberties; and (3) fitness of the controversy for judicial review."

---

[4]      In a broader sense, the ripeness requirement implicates a federal court's subject matter jurisdiction under Article III's case and controversy clause. *Acorn v. City of Tulsa, Okla.*, 835 F.2d 735, 738 (10th Cir. 1987). When a defendant challenges a claim's ripeness, it is, in effect, a challenge to the court's subject matter jurisdiction. *New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1498–99 (10th Cir. 1995).

Typically, the federal courts view such a challenge as a motion under Fed. R. Civ. P. 12(b)(1). *Id.* at 1499. Here, defendant has not challenged the court's subject matter jurisdiction. Instead, he claims that plaintiff likely will not succeed on the merits because her claim is not ripe. Doc. 11 at 8. But because a claim's ripeness affects the court's subject matter jurisdiction, the court must consider it before deciding any substantive matter. *See Friends of Marolt Park v. U.S. Dep't of Transp.*, 382 F.3d 1088, 1093 (10th Cir. 2004) ("Before we reach the merits of appellant's claims, we must examine whether the issues raised in this case are ripe for review.").

*Richardson*, 64 F.3d at 1500.  Because these factors are not ones that apply themselves in a self-evident fashion, the next three subsections discuss them at some length.

### A.      "Hardship to the Parties by Withholding Review"

This first factor requires the court to "ask whether the [Kansas Law] create[s] a 'direct and immediate dilemma for the parties.'" *Stout*, 519 F.3d at 1117 (quoting *Richardson*, 64 F.3d at 1500).  *Stout* illustrates how to apply this factor.  There, two candidates for popularly elected judicial office challenged two provisions in the Kansas Code of Judicial Conduct.  *Id.* at 1111.  The provisions prohibited candidates for judicial office from making certain pledges and personally soliciting support for their campaigns.  *Id.*  Two candidates sued, presenting both a facial and as applied challenge asserting that these restrictions infringed their First Amendment rights of political expression.  *Id.*  Our court concluded that the claims were ripe and found that plaintiffs likely would succeed on the merits.  *Id.*  It thus entered a preliminary injunction forbidding enforcement of the provisions.  *Id.*

On appeal, *Stout*'s defendants again challenged the ripeness of plaintiffs' claims.  *Id.* at 1115–16.  They argued that no one had initiated a disciplinary action against the judicial candidates for violating the restrictions and so, "plaintiffs' fears of prosecution are illusory."  *Id.* at 1117.  The Circuit rejected defendants' argument, reasoning:  "So long as the [provisions] remain in effect in their current form, the state is free to initiate such action against candidates [for judicial office]."  *Id.* at 1118 (citing *Grant v. Meyer*, 828 F.2d 1446, 1449 (10th Cir. 1987) (explaining that when fear of sanction "is not imaginary or wholly speculative, a plaintiff need not first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute") (internal citation and quotation omitted)).

The Kansas Law challenged in the current case puts plaintiff in a different posture than the plaintiffs in *Richardson* and *Stout*. Ms. Koontz's boycott of Israel does not expose her to fear of prosecution (as in *Richardson*, 64 F.3d at 1501) or professional discipline (as in *Stout*, 519 F.3d at 1118). Instead, the Kansas Law simply disqualifies plaintiff from eligibility for reaping the benefits of a contract with the State of Kansas that she otherwise would have received, *i.e.*, a contract compensating plaintiff for serving as a trainer for the Math and Science Partnership. But the court concludes that this difference is immaterial. The challenged Kansas Law still imposes a hardship on plaintiff and, potentially, others subject to its disqualifying provision. As long as the Kansas Law "remains in effect in [its] current form, the state is free" to use it to disqualify other contractual aspirants. *Stout*, 519 F.3d at 1118. As in *Stout*, this presents the requisite hardship for purposes of the ripeness analysis.

### B.    Potential "Chilling Effect of the Challenged Law on First Amendment Liberties"

The second factor of the relaxed ripeness test requires the court to assess "the chilling effect the challenged law may have on First Amendment liberties." *Id.* at 1116 (citing *Richardson*, 64 F.3d at 1499–1500). In its cases applying this factor, the Circuit has expressed an important corollary to it. When the challenged statute is unconstitutionally vague, that vagueness "greatly militates in favor of finding an otherwise premature controversy to be ripe." *Id.* at 1118 (citing *Richardson*, 64 F.3d at 1503). Indeed, the Circuit has observed that a plaintiff "should not have to risk prosecution, under a statute whose scope is unclear, before [her] challenge to the constitutionality of that statute is ripe." *Richardson*, 64 F.3d at 1503.

This corollary, then, frames the threshold question under this second factor: Is the Kansas Law challenged here vague? In one sense, it is not. It imposes a bright line rule. All prospective contractors must certify to Kansas that they are not boycotting Israel. *See* Kan. Stat.

Ann § 75-3704f(a).  If they don't so certify, they can't contract with the state.  But a second aspect of the Kansas Law injects a significant degree of uncertainty.  This provision authorizes the Kansas Secretary of Administration to waive the Kansas Law's certification requirement "if the secretary determines that compliance is not *practicable*."  *Id.* § 75-3704f(c) (emphasis added).

When is compliance "not practicable?"  The Kansas Law does not say.  Indeed, it provides no guidance about the meaning intended for this important term.  Defendant's Opposition to plaintiff's injunction motion (Doc. 11) is mum on the subject as well.  It never mentions the issue at all.  But at oral argument, defense counsel described the standard applied to date by Kansas's Secretary of Administration.  The Secretary has received, defense counsel represented, a few requests to waive the certification requirement.  Some requests were submitted by putative contractors who asserted that they just didn't "want to fill out another government form and deal with the state government to be a contractor."  Counsel argued that the Secretary reasonably had determined it was "practicable" for these stubborn applicants to comply with the Kansas Law's certification requirement.  Counsel contrasted this kind of contractor with Ms. Koontz.  He explained that the plaintiff is "a member of a church, a church [where] there's a religious belief that would oppose doing business with Israel."  So, defense counsel asserted, the Secretary of Administration "would grant the waiver when presented with evidence; [but] not [grant a waiver to a contractor who] just [said,] 'I don't want to do it.'"

The court is not yet prepared to decide the constitutional sufficiency of such a malleable, uncertain definition for a term so central to the Kansas Law and to the ripeness analysis of plaintiff's claim.  But the court has sufficient information to decide that "the arguable vagueness of [the Kansas Law] greatly militates in favor of a finding of ripeness."  *Stout*, 519 F.3d at 1118.

A potential contractor "should not have to risk [exclusion], under a statute whose scope is unclear, before [her] challenge to the constitutionality of that statute [becomes] ripe." *Richardson*, 64 F.3d at 1503. As in *Richardson* and *Stout*, this "potential vagueness" may increase the hardship to plaintiff and others, and the generalized chilling effect on speech. *Id.* The court thus concludes that this second factor also favors a finding that plaintiff's claim is ripe for adjudication.

### C.     Fitness of the Controversy for Judicial Review

The third and final factor of the relaxed ripeness test considers whether the controversy presented by plaintiff's claim is one fit for judicial review. *Stout*, 519 F.3d at 1116. Our Circuit explained that this factor focuses on "whether determination of the merits turns upon strictly legal issues or requires facts that may not yet be sufficiently developed." *Richardson*, 64 F.3d at 1499. Also, the Circuit has held, a "[F]irst [A]mendment challenge to the facial validity of a statute is a strictly legal question; it does not involve the application of the statute in a specific factual setting." *ACORN v. City of Tulsa, Okla.*, 835 F.2d 735, 740 (10th Cir. 1987); *accord Awad v. Ziriax*, 670 F.3d 1111, 1124–25 (10th Cir. 2012). And even when a case presents an as applied challenge, it is fit for judicial review if "the facts of the case are relatively uncontested." *Stout*, 519 F.3d at 1118.

Here, Ms. Koontz presents a facial challenge to the Kansas Law under the First Amendment. This brings it within the holding in *ACORN* and *Awad*. And even if one construed the case's claims as ones presenting only an as applied challenge—which the court does not—the facts controlling that analysis are not disputed materially.

### D.     *ACORN v. Tulsa*

While sections A, B, and C complete the analysis required by the three-part relaxed ripeness test, the court devotes a fourth section to the ripeness discussion in *ACORN v. Tulsa*.

835 F.2d 735.  It does so because the Circuit's discussion there is particularly informative about the correct analysis here.

In *ACORN*, the plaintiffs brought a facial First Amendment challenge to an ordinance adopted by the City of Tulsa, Oklahoma.  *Id.* at 738.  The challenged ordinance prohibited public gatherings in public parks and also forbade posting signs in parks without approval by the Tulsa Park and Recreation Board.  *Id.* at 736.  Plaintiffs had made plans to protest in one of Tulsa's city parks but various city officials told them that only the Park and Recreation Board could approve their planned protest.  *Id.* at 737–38.  Plaintiffs never asked that board for permission to protest in the park and, instead, conducted their protest gathering on private property.  *Id.* at 738. Afterward, plaintiffs sued the city, alleging that the ordinance violated the First Amendment on its face.  *Id.*  Their suit sought to recover damages for past harm and also asked to enjoin future enforcement of the ordinance.  *Id.*

The district court held plaintiffs' challenge was not ripe for judicial review because the plaintiffs never had asked the Park and Recreation Board for permission to protest in the park. *Id.*  The Tenth Circuit disagreed.  It held that a request seeking the board's permission to protest in the park was not a prerequisite to filing suit.  *Id.* at 739.  It emphasized, "'applying for and being denied a license or an exemption is not a condition precedent to bringing a facial challenge to an unconstitutional law.'"  *Id.* (quoting *ACORN v. Golden*, 744 F.2d 739, 744 (10th Cir. 1984)).  *ACORN* also noted that Tulsa's ordinance was chilling plaintiffs' speech rights because the city could prosecute them for conduct that violated the ordinance.  And the suit presented a clearly framed legal issue:  whether the ordinance was unconstitutional, regardless of how Tulsa enforced it.  *Id.*  Reasoning that the case presented a strictly legal question and the ordinance

could cause an irretrievable loss of speech rights, the Circuit held the case was ripe for review. *Id.* It thus reversed the district court's ripeness determination.

Defendant's ripeness argument here contradicts *ACORN.* He argues that plaintiff's challenge to the Kansas Law is not ripe because she never asked the Secretary of Administration to waive the certification requirement. He also supplies evidence—an affidavit from the Secretary of Administration—asserting that the Secretary would have granted the waiver if plaintiff only had asked. But *ACORN* squarely held that "applying for and being denied a license or exemption is not a condition precedent to bringing a facial challenge to an unconstitutional law." *Id.* Plaintiff's challenge presents a facial challenge to the Kansas Law and so, *ACORN*'s holding excuses plaintiff from applying for an exemption.[5]

### E.    Conclusion:  Plaintiff's Claim is Ripe for Judicial Review

The court concludes that Ms. Koontz's First Amendment challenge to the Kansas Law is ripe for judicial review under the relaxed ripeness test applied to facial challenges under the First Amendment. It thus rejects defendant's arguments to the contrary.

## III.    Mootness

Defendant's memorandum opposing plaintiff's injunction motion also references mootness.[6] While it is not clear, it appears that he referenced mootness merely as an adjunct to his ripeness defense. *See* Doc. 11 at 10–11 (arguing that had plaintiff requested a waiver under

---

[5]      Defendant primarily relies on *Levin v. South Carolina Department of Health & Human Services*, 12-CV-0007, 2015 WL 1186370  (D.S.C. Mar. 16, 2015), for his ripeness argument. But it is of no consequence here. The plaintiff in *Levin* presented no First Amendment challenges—facial, as applied, or otherwise. So, as one would expect, *Levin* applied the two-part test generally applied to assess ripeness. *See id.* at *9 (considering "(1) fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration"); *see also Yeutter*, 911 F.2d at 1415 (summarizing the two-part ripeness test typically applied). *Levin* did not apply or even mention the relaxed ripeness test applied in First Amendment cases like this one.

[6]      Even if defendant does not present a mootness challenge, the court has a duty to assure itself that a case is not moot because, like ripeness, mootness is a jurisdictional prerequisite that the court must determine before proceeding. *Jordan v. Sosa*, 654 F.3d 1012, 1023 (10th Cir. 2011) ("The mootness doctrine provides that although there may be an actual and justiciable controversy at the time the litigation is commenced, once that controversy ceases to exist, the federal court must dismiss the action for want of jurisdiction." (internal quotation omitted)).

the Kansas Law, the Secretary of Administration would have granted it and thus mooted the entire dispute).

The mootness doctrine is "grounded in the requirement that any case or dispute that is presented to a federal court be definite, concrete and amenable to specific relief." *Jordan v. Sosa*, 654 F.3d 1012, 1024 (10th Cir. 2011) (emphasis omitted). These requirements derive from Article III's case or controversy clause, which requires that "'an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed.'" *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1121 (10th Cir. 2010) (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997)).

While it is not entirely clear, it seems that defendant may have intended to invoke the voluntary cessation doctrine. Under it, a defendant cannot moot a case by voluntary ceasing the allegedly wrongful conduct if the defendant could engage in the conduct again after a court would dismiss a case challenging it. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000).

Here, the affidavit from the Secretary of Administration asserts that she would have granted plaintiff a waiver of the certification requirement. But dismissing the case because defendant gave a waiver to plaintiff still would permit defendant to deny a waiver to others, or revoke a waiver given to plaintiff after the court dismisses her suit. These actions would prevent the court from reviewing the constitutionality of the Kansas Law, which is what the voluntary cessation doctrine aims to prevent. *See Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) ("We have recognized, however, that a defendant cannot automatically moot a case simply by ending its unlawful conduct once sued. Otherwise, a defendant could engage in unlawful conduct, stop

when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends." (internal citation omitted)).

Here, defendant never asserts that he permanently will abandon enforcement of the Kansas Law's certification requirement.  Given this, the dispute presented by plaintiff's Complaint presents a "definite, concrete and amenable to specific relief" claim.  *Jordan*, 654 F.3d at 1024.  The claim is not moot.

## IV.    The Preliminary Injunction Analysis

Having concluded that Ms. Koontz's challenge to the Kansas Law presents a claim that is ripe but not moot, the court now turns to the merits of the pending motion.  This motion seeks a preliminary injunction pending a final judgment in the case.  Specifically, plaintiff asks for an order that temporarily enjoins defendant from enforcing the requirement established in Kan. Stat. Ann. § 75-3740f—or any other like Kansas law, policy, or practice—that state contractors must declare they are not boycotting Israel.  The court begins its analysis of this request for relief with an overview of the requisite showing.  It then applies that standard to the request made by plaintiff's motion.

### A.    The Showing a Party Must Make to Deserve a Preliminary Injunction

Federal Rule of Civil Procedure 65(a) authorizes district courts to issue preliminary injunctions.  The relief afforded under this rule has a limited purpose—a preliminary injunction is "merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).  The Tenth Circuit has specified the following standard for district courts to follow when deciding whether to issue a preliminary injunction:

> "To obtain a preliminary injunction the moving party must demonstrate: (1) a likelihood of success on the merits; (2) a likelihood that the moving party will

> suffer irreparable harm if the injunction is not granted; (3) the balance of equities is in the moving party's favor; and (4) the preliminary injunction is in the public interest."

*Verlo v. Martinez*, 820 F.3d 1113, 1126 (10th Cir. 2016) (quoting *Republican Party of N.M. v. King*, 741 F.3d 1089, 1092 (10th Cir. 2013)).  The court has discretion to decide whether to grant a preliminary injunction.  *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009) (citations omitted).  "[The Tenth Circuit] reviews a district court's grant of a preliminary injunction for abuse of discretion."  *Verlo*, 820 F.3d at 1124 (internal quotation omitted).  "'A district court abuses its discretion when it commits an error of law or makes clearly erroneous factual findings.'"  *Id.* (quoting *Moser*, 747 F.3d at 822).

A preliminary injunction is an extraordinary remedy.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  So, the right to such relief must be "clear and unequivocal."  *Petrella v. Brownback*, 787 F.3d 1242, 1256 (10th Cir. 2015) (quoting *Beltronics, USA, Inc.*, 562 F.3d at 1070).  "In general, 'a preliminary injunction . . . is the exception rather than the rule.'"  *Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007) (quoting *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984)).

The parties here agree about some things.  For example, they agree about the facts.  They also agree that plaintiff must make the four showings required by *Verlo v. Martinez*, among other cases.  But predictably, they disagree sharply about how the court should apply those four requirements.

For one, defendant argues that a preliminary injunction here would alter the status quo—not preserve it—thus increasing plaintiff's burden.  Specifically, defendant contends, when a district court considers a preliminary injunction that would alter the status quo, the court must "closely scrutinize[] [the movant's request] to assure that the exigencies of the case support the

14

granting of a remedy that is extraordinary even in the normal course." *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004) (en banc). While it is unclear whether the requested injunction would alter the status quo in the way the cases apply this term of art, the court need not resolve that question to decide the motion. As the following analysis explains, the court concludes that plaintiff meets even the heavier burden that defendant advocates. The court thus assumes, without deciding, that the requested preliminary injunction would alter the status quo. It thus "closely scrutinizes" Ms. Koontz's request for a preliminary injunction.

### 1.    Is plaintiff likely to succeed on the merits of her claim?

Plaintiff asserts that by enforcing the Kansas Law, defendant is violating 42 U.S.C. § 1983. A defendant is liable under § 1983 if he deprives a person of a constitutional right under color of state law. 42 U.S.C. § 1983. Neither party contests that defendant is acting under color of state law. But the parties contest whether defendant has deprived plaintiff of a constitutional right.

Plaintiff asserts a variety of legal theories that show defendant is depriving plaintiff of a constitutional right. *See* Doc. 4 at 10–23. But the court concludes it must address just one of them to decide the current motion.

Under the First Amendment,[7] states cannot retaliate or impose conditions on an independent contractor "'on a basis that infringes his constitutionally protected freedom of speech.'" *Bd. of Cty. Comm'rs, Wabaunsee Cty., Kan. v. Umbehr*, 518 U.S. 668, 674 (1996) (quoting *Perry v. Sindermann*, 408 U.S. 593, 597 (1972)) (alteration omitted). To determine whether a state is infringing on an independent contractor's rights under the First Amendment,

---

[7]    The First Amendment applies to the states through the Fourteenth Amendment's Due Process Clause. *iMatter Utah v. Njord*, 774 F.3d 1258, 1263 (10th Cir. 2014) (citations omitted).

courts use the same guidelines developed in *Pickering v. Board of Education of Township High School District 205, Will County, Illinois*, 391 U.S. 563 (1968), and its progeny.  *Umbehr*, 518 U.S. at 678.

The *Pickering* test requires plaintiff to show, first, that the First Amendment protects the conduct that she claims led to the state denying a benefit.  *Id.* at 675.  If the plaintiff succeeds on this showing, the government can justify its decision by showing that "legitimate countervailing government interests are sufficiently strong" to justify its encroachment.  *Id.*  Under the *Pickering* test, when a law has a widespread effect and the potential to chill speech before it happens, the government must show the speech's "'necessary impact on the actual operation'" of the government outweighs the interests of the speakers and their audiences.  *United States v. Nat'l Treasury Emp. Union*, 513 U.S. 454, 468 (1995) (quoting *Pickering*, 391 U.S. at 571) (holding that a governmental ban on employees receiving academic honorary degrees was unconstitutional).  To make this showing, the government must establish a real harm that the law will alleviate directly.  *Id.* at 475.

Plaintiff here has met her initial burden.  The First Amendment protects the right to participate in a boycott as the Supreme Court held explicitly in *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 907 (1982).

In *Claiborne*, defendants—supporters of civil rights—organized a boycott of all white merchants after city and county officials had refused defendants' demands for racial equality.  *Id.* at 899–900.  Plaintiffs—a group of white merchants—sued in Mississippi state court seeking to recover damages they had lost because of the boycott.  *Id.* at 889.  After an eight-month trial, the judge imposed liability on the boycotters under three distinct conspiracy theories.  *Id.* at 890–91.  All three sounded in state law.  *Id.* at 891.  The state trial court also rejected the boycotters'

16

argument that the First Amendment prohibited the court from imposing liability on them based on their boycott. *Id.* at 891–92. The Mississippi Supreme Court affirmed the trial court's imposition of liability and again rejected the defendants' argument that the First Amendment protected them from liability. *Id.* at 895.

The Supreme Court granted certiorari and reversed the Mississippi Supreme Court. *Id.* at 912. The Court emphasized, "[w]hile States have broad power to regulate economic activity, we do not find a comparable right to prohibit peaceful political activity such as that found in the boycott in this case." *Id.* at 913. While states broadly can regulate boycotts that aim to suppress competition or target companies involved with labor disputes, *id.* at 912, their regulatory power over boycotts is limited when the boycott's main purpose is to influence governmental action, *id.* at 914.

The Supreme Court explained that the boycott at issue in *Claiborne* included many elements. *Id.* at 907. Participants met with other likeminded individuals to organize and discuss the boycott. *Id.* They supported the boycott with speeches, nonviolent picketing, and encouragement to others to join their cause. *Id.* And all this was done to bring about change in society and government. *Id.* After reviewing the components of the *Claiborne* boycott, the Court noted:

> Each of these elements of the boycott is a form of speech or conduct that is ordinarily entitled to protection under the First and Fourteenth Amendments. The black citizens . . . banded together and collectively expressed their dissatisfaction with a social structure that had denied them rights to equal treatment and respect.

*Id.* (footnote omitted). This, the Supreme Court held, is a key tenet of the First Amendment. *Id.* at 908.

The same analysis applies to the Kansas Law. The conduct prohibited by the Kansas Law is protected for the same reason as the boycotters' conduct in *Claiborne* was protected. Ms.

Koontz, other members of the Mennonite Church, and others have "banded together" to express,

collectively, their dissatisfaction with Israel and to influence governmental action.  Namely, its

organizers have banded together to express collectively their dissatisfaction with the injustice

and violence they perceive, as experienced both by Palestinians and Israeli citizens.  She and

others participating in this boycott of Israel seek to amplify their voices to influence change, as

did the boycotters in *Claiborne*.  The court concludes that plaintiff has carried her burden on the

current motion to establish that she and others are engaged in protected activity.[8]

Ms. Koontz's satisfaction of her initial burden shifts the burden to defendant.  *Umbehr*,

518 U.S. at 675.  He must show that Kansas has a strong, legitimate interest in enforcing the

Kansas Law.  *Id.*  Defendant fails to meet his burden.

When evaluating whether a law serves a compelling governmental purpose, a court must

inquire into the circumstances of the law's enactment.  *Doe v. City of Albuquerque*, 667 F.3d

1111, 1132 (10th Cir. 2012).  The Kansas Law's legislative history reveals that its goal is to

undermine the message of those participating in a boycott of Israel.  This is either viewpoint

discrimination against the opinion that Israel mistreats Palestinians or subject matter

discrimination on the topic of Israel.  Both are impermissible goals under the First Amendment.

*See Police Dep't of City of Chi. v. Mosley*, 408 U.S. 92, 95 (1972) ("[T]he First Amendment

---

[8]      In some respects, the issue here is easier than the one in *Claiborne*.  In that case, some of the boycotters had
exerted discipline against persons who refused to join their boycott.  *Id.* at 903–04.  Some of this discipline directed
illegal, violent conduct at persons who refused to join the boycott, *i.e.*, shots fired at a house, a brick thrown through
a car's windshield, and some whiskey being stolen.  *Id.* at 904–05.  As the Court emphasized, "The First
Amendment does not protect violence."  *Id.* at 916 (citing *Samuels v. Mackell*, 401 U.S. 66, 75 (1971) (Douglas, J.,
concurring) ("Certainly violence has no sanctuary in the First Amendment, and the use of weapons, gunpowder, and
gasoline may not constitutionally masquerade under the guise of advocacy.").  But violent, illegal, conduct by some
boycotters did not strip other, legal conduct of its protected characteristic.  *Id.* at 908 ("The right to associate does
not lose all constitutional protection merely because some members of the group may have participated in conduct
or advocated doctrine that itself is not protected.").  Here, no one contends that Ms. Koontz or her fellow boycotters
have done anything illegal or violent.  To say it simply, the boycott here does not present any of the complicating
facts present in *Claiborne*.

means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.").

The Kansas Law also aims to minimize any discomfort that Israeli businesses may feel from the boycotts. This, too, is an impermissible goal. *See, e.g.*, *Matal v. Tam*, 137 S. Ct. 1744, 1763 (2017) ("We have said time and again that 'the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers.'" (quoting *Street v. New York*, 394 U.S. 576, 592 (1969))).

But even if one assumed that Kansas had passed the law to achieve constitutionally permissible goals that would not change the outcome here. It is still unconstitutional because it is not narrowly tailored to achieve those permissive goals. If Kansas had passed its law to regulate boycotts intended to suppress economic competition coming from Israel—a goal that *Claiborne* permits[9]—the Kansas Law is overinclusive. It is overinclusive because it also bans political boycotts, which is impermissible. *See Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964) ("[S]peech concerning public affairs is more than self-expression; it is the essence of self-government."). Likewise, if the Kansas Law's goal is to promote trade relations with Israel— also a permissible goal—the Kansas Law is underinclusive because it only regulates boycotts but does not regulate other conduct that affects trade.

The authority the Kansas Law grants the Secretary of Administration to waive the certification requirement also undermines any rationale offered by defendant. As the Supreme Court noted in *City of Ladue v. Gilleo*, 512 U.S. 43 (1994), "Exemptions from an otherwise legitimate regulation of a medium of speech . . . may diminish the credibility of the government's rationale for restricting speech in the first place." *Id.* at 52.

---

[9]     *See* 458 U.S. at 912 ("The right of business entities to 'associate' to suppress competition may be curtailed [by states].").

The defendant's written Opposition to plaintiff's injunction motion never argued the constitutionality of the Kansas Law.  At the hearing on the motion, the court asked defense counsel to address this omission.  He did.  When asked whether there was an argument to be made that the Kansas Law is indeed constitutional, defense counsel said there was.  He cited *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47 (2006).

In *Rumsfeld*, the Congress had enacted a law requiring a law school, to be eligible for federal funding, to "offer military recruiters the same access to its campus and students that it provides to the nonmilitary recruiter receiving the most favorable access."  *Id.* at 55.  Arguing that the law violated the First Amendment, a group of law schools sued.  *Id.* at 51.  They argued that the law made them choose between receiving federal funding and allowing the military to recruit on campus.  *Id.* at 53.  According to the law schools, this amounted to the law compelling the schools to speak a certain message, in violation of the First Amendment.  *Id.*

The Supreme Court disagreed.  *Id.* at 60.  The law schools argued that the law forced them to speak by "send[ing] e-mails or post[ing] notices on bulletin boards on an employer's behalf."  *Id.* at 61.  But the Supreme Court concluded that this speech was incidental to the law's regulation of conduct.  *Id.* at 62.  And the government can regulate conduct under the First Amendment so long as the conduct is not inherently expressive.  *Id.* at 65–66.  Conduct is inherently expressive when someone understands that the conduct is expressing an idea without any spoken or written explanation.  *Id.* at 66 (citing *Texas v. Johnson*, 491 U.S. 397, 406 (1989) (holding that the First Amendment protects a person's right to burn the flag because a person understands this conduct expressed disdain of an idea)).  The Court concluded that the law schools' refusal to allow military recruiters to recruit on campus was not expressive of an idea.

*Id.* It reasoned that people could understand that the schools were expressing an idea only if the schools explicitly explained why the military recruiters were off-campus. *Id.* at 66.

The Supreme Court also concluded that the law did not force the law schools to host or accommodate the military's message. *Id.* at 64. The Court noted that in some circumstances, the Court had struck down laws that forced private parties to accommodate a message they opposed. *Id.* at 63. But the Supreme Court explained that in every one of those cases, the "speaker's own message was affected by the speech it was forced to accommodate." *Id.* For instance, a law requiring parade organizers to include a certain group altered the parade organizer's speech because "'every participating [group] affects the message conveyed by the parade's private organizers . . . .'" *Id.* (internal bracket omitted) (quoting *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Bos.*, 515 U.S. 557, 572–73 (1995)). In contrast to parades, hosting employment interviews and holding recruiting receptions lacked an expressive quality. *Id.* at 64.

The Kansas Law here is different than the requirement at issue in *Rumsfeld*. The conduct the Kansas Law aims to regulate is inherently expressive. *See Claiborne*, 458 U.S. at 907–08. It is easy enough to associate plaintiff's conduct with the message that the boycotters believe Israel should improve its treatment of Palestinians. And boycotts—like parades—have an expressive quality. *Id.* Forcing plaintiff to disown her boycott is akin to forcing plaintiff to accommodate Kansas's message of support for Israel. Because the Kansas Law regulates inherently expressive conduct and forces plaintiff to accommodate Kansas's message, it is unlike the law at issue in *Rumsfeld*. The court thus finds defendant's reliance on *Rumsfeld* misplaced.

In sum, the court holds that plaintiff is likely to succeed on the merits. This is so even if—as defendant contends—a preliminary injunction would alter the status quo. The court has

"closely scrutinized [plaintiff's] request" and concludes "that the exigencies of the case support granting" this extraordinary remedy.  *O Centro Espirita*, 389 F.3d at 975.

### 2.     Will plaintiff suffer irreparable harm if the court does not grant an injunction?

Next, plaintiff must establish that she will sustain irreparable harm absent a preliminary injunction.  *Verlo*, 820 F.3d at 1126.  To show irreparable harm, plaintiff must show that her injury is certain, great, and not "merely serious or substantial."  *Port City Props. v. Union Pac. R.R. Co.*, 518 F.3d 1186, 1190 (10th Cir. 2008).  Economic loss "usually does not, in and of itself, constitute irreparable harm."  *Id.* (internal quotation and citation omitted).

Ms. Koontz asserts that the analysis is simple.  She is correct.  The Supreme Court squarely has decided this point.  "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (citing *N.Y. Times Co. v. United States*, 403 U.S. 713 (1971)).  *Elrod* demonstrates this principle's vitality.  In *Elrod*, the Republican Sheriff of Cook County, Illinois was replaced by a Democrat.  *Id.* at 350.  The new Sheriff discharged plaintiffs, all Republicans and non-civil service employees of the Sheriff's office and thus unprotected from arbitrary discharge.  *Id.* at 351.  This conformed to a long-standing practice where a newly installed Sheriff typically required such employees to join the new Sheriff's political party or face dismissal.  *Id.*  Plaintiffs challenged their dismissal—or, for one plaintiff, his looming dismissal—in federal court.  They claimed that it encroached on freedoms protected by the First Amendment.  *Id.*  For relief, they sought a preliminary injunction.  *Id.*

The district court declined to issue a preliminary injunction, reasoning that loss of employment did not constitute irreparable harm.  *Id.* at 373.  Such loss, if later proved to be unconstitutional, could be compensated with back pay, which would be an adequate remedy.  *Id.*

The Seventh Circuit disagreed, and directed the district court to issue the injunction. *Id.* The Supreme Court affirmed the Circuit's decision. *Id.* The Court explained, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Id.* The Court held that the plaintiffs lost those freedoms when the defendant fired them because of their political beliefs. *Id.* at 374.

Defendant here makes a similar argument to the one discredited in *Elrod*. He argues that Ms. Koontz will not sustain irreparable harm if the Kansas Law's certification requirement is left in place while the case is adjudicated on the merits. Defendant says that plaintiff can present evidence about the number of training sessions she would have conducted. And since each session fetches a payment of $600, simple math will permit a damage award to make her whole—assuming the court concludes that defendant has disenfranchised her constitutional rights.

While this argument has a pragmatic appeal, it is not one the First Amendment will abide. As referenced above, the Supreme Court already has decided the question. *See id.* at 373. This is so because "[t]he timeliness of political speech is particularly important . . . . '[It] enable[s] every citizen at any time to bring the government and any person in authority to the bar of public opinion . . . .'" *Id.* at 373 n.29 (internal quotation and brackets omitted) (quoting *Wood v. Georgia*, 370 U.S. 375, 392 (1962) (further citation omitted)).

Nor will the pragmatic appeal of defendant's argument withstand closer scrutiny. Ms. Koontz has sued defendant in his official capacity. Doc. 1 ¶ 7. The Eleventh Amendment forbids recovery of damages in federal court suits against state officials sued in their official capacity. *See Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010) (holding a movant for preliminary injunction would sustain irreparable harm because sovereign

immunity would bar damage recovery).  Our Circuit long has recognized that an award of money damages that the plaintiff cannot recover "for reasons such as sovereign immunity constitutes irreparable injury." *Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1157 (10th Cir. 2011) (collecting cases).

Defendant also argues that plaintiff's harm is not imminent because she already has refused to sign the certification.  And, defendant argues, any future trainings plaintiff might give are speculative.  To support his argument, defendant cites *Pinson v. Pacheco*, 397 F. App'x 488 (10th Cir. 2010), and *Schrier v. University of Colorado*, 427 F.3d 1253 (10th Cir. 2005).  But his faith in those cases is misplaced.  They are materially different.

In *Pinson*, the Tenth Circuit held that a movant for a preliminary injunction had failed to show irreparable harm.  *Id.* at 492.  The movant claimed that he would sustain irreparable harm because federal prison officials had refused to honor his request not to be housed in the same institution as prisoners "'who pose a known, specific risk of harm toward [p]laintiff.'"  *Id.* (quoting the motion for preliminary injunction).  Because plaintiff produced no specific evidence of any threats towards him in the institution where the officials placed him, *Pinson* held simply that the harm alleged by plaintiff was speculative.  *Id.*

In *Schrier*, the district court denied plaintiff's preliminary injunction motion.  427 F.3d at 1267.  The injunction he sought, if granted, would have required defendant to reinstate plaintiff in his former job after defendant had terminated plaintiff's employment, allegedly because of plaintiff's speech.  *Id.*  The Tenth Circuit affirmed the district court's decision not to grant the injunction, in part, because plaintiff had failed to show irreparable harm.  *Id.*  The Tenth Circuit concluded that the harms already had occurred and the injunction could not cure them.  *Id.*  And

24

also, plaintiff failed to show that defendant's action violated his First Amendment rights. *Id.* at 1266. The harm thus was not imminent. *Id.* at 1267.

Here, defendant's argument focuses on the wrong harm. Plaintiff's harm stems not from her decision to refuse to sign the certification, but rather from the plainly unconstitutional choice the Kansas Law forces plaintiff to make: She either can contract with the state or she can support a boycott of Israel. Her harm is ongoing because the Kansas Law is currently chilling plaintiff's and other putative state contractors' speech rights.

In short, the court finds that Ms. Koontz has shown that she will sustain irreparable harm unless the court enjoins defendant from enforcing the Kansas Law's certification requirement. She thus has shouldered her burden on the second element of the injunction standard.

### 3. Does plaintiff's irreparable harm outweigh any harm defendant will sustain if the court grants the preliminary injunction?

Plaintiff next argues that her irreparable harm outweighs any harm defendant would bear if the court issued a preliminary injunction. Plaintiff asserts that defendant "does not have an interest in enforcing a law that is likely constitutionally infirm." *See Edmondson*, 594 F.3d at 771. Plaintiff also argues that a preliminary injunction against the Kansas Law would maintain the status quo because the Kansas Law is sufficiently new that any harm to the State of Kansas and defendant is minimal. On the other hand, plaintiff argues that she and other state contractors will suffer great harm because defendant is depriving them of a constitutional right.

Defendant argues that plaintiff has not shown any imminent or threatened injury and an injunction will harm Kansas and defendant greatly. Defendant notes that in 2016, Kansas exported more than $56 million worth of goods to Israel and imported more than $83 million worth of goods. Defendant fears that enjoining the Kansas Law will cause Israeli companies to refuse to do business in Kansas, or with Kansas companies, and thus harm the Kansas economy.

Defendant's argument is not persuasive.  Defendant adduced no evidence that Israeli companies will refuse to do business in or with the State of Kansas unless its ban against Israeli boycotts is enforced.  And defendant has not forwarded any evidence that Kansas commerce has increased because of, or in anticipation of, the boycott ban.  If such evidence existed, one would expect the defense to have access to it and have presented it.  It didn't.

After balancing the relative harms imposed by a preliminary injunction, the court finds that the continuing harm to plaintiff's First Amendment rights—and those of persons similarly situated—outweighs defendant's speculative suggestion that an injunction will harm him, the State of Kansas, or Kansas merchants.  Ms. Koontz has carried her burden on this third part of the injunction test.

### 4. Is the requested injunction adverse to the public harm?

The fourth and final touchstone of the preliminary injunction standard requires the injunction's proponent to show that it will not be adverse to the public interest.  Plaintiff argues that a preliminary injunction will serve the public interest because it will protect constitutional rights.  *See Edmunson*, 594 F.3d at 771 ("'[T]he public interest will [certainly] be served by enjoining the enforcement of the invalid provisions of state law.'" (quoting *Bank One, Utah v. Guttau*, 190 F.3d 844, 848 (8th Cir. 1999))).

Defendant argues that an injunction will not serve the public interest because Israel is an important trade partner, as explained above.  Defendant also argues that it is in the public interest to enforce a law that prevents Kansans from discriminating against foreign companies doing business in Kansas.  Last, defendant argues that enforcing the Kansas Law is in the public interest because the Kansas Law passed the Kansas House 99 to 13 and the Kansas Senate 36 to 3.

Here, the court already has concluded that it is highly likely that the Kansas Law is invalid and thus enjoining it will protect a constitutional right.  *See supra*, Part IV.A.1.  Defendant has failed to produce evidence that an injunction will affect Kansas's relationship with Israeli companies.  While the Kansas Law may have been passed by the legislature with flying colors, that showing merely would demonstrate that one state legislature had enacted a statute.  Such a showing would not place the Kansas Law on the same level as an amendment to our Constitution—the very first amendment adopted by our founders and one ratified by three fourths of our states.  *See* U.S. Const. art. V.  A desire to prevent discrimination against Israeli businesses is an insufficient public interest to overcome the public's interest in protecting a constitutional right.  The court finds that an injunction will serve the public interest.

## V.      Conclusion

For reasons explained above, the court grants plaintiff's Motion for Preliminary Injunction (Doc. 3).

**IT IS THEREFORE ORDERED THAT** plaintiff's Motion for Preliminary Injunction (Doc. 3) is granted.  Defendant is preliminarily enjoined from enforcing Kan. Stat. Ann. § 75-3740f and any other Kansas statute, law, policy, or practice that requires independent contractors to declare that they are not participating in a boycott of Israel.  Pending further order from this court, the court enjoins defendant from requiring any independent contractor to sign a certification that they are not participating in a boycott of Israel as a condition of contracting with the State of Kansas.

**IT IS FURTHER ORDERED THAT** the parties must meet and confer to discuss a proposed schedule for the remainder of this case.  Counsel for the parties are directed to contact the chambers of United States Magistrate Judge K. Gary Sebelius to request a Scheduling

Conference to govern the remainder of the case.  Counsel may either call his chambers at 785-338-5480 or email ksd_sebelius_chambers@ksd.uscourts.gov.

**IT IS SO ORDERED.**

**Dated this 30th day of January, 2018, at Topeka, Kansas.**


**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**

28